**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Roderic CARTER, Defendant–Appellant.**

**No. 91–1830.**

United States Court of Appeals, Sixth Circuit.

Argued April 3, 1992.

Decided July 8, 1992.

Ronald W. Waterstreet, Asst. U.S. Atty. (argued and briefed), Detroit, Mich., for U.S.

Brian M. Legghio (argued and briefed), Roseville, Mich., for Roderic Carter.

Before: MERRITT, Chief Judge, and MARTIN and SILER, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Roderic Carter appeals his conviction for (1) conspiracy to possess with intent to distribute and distribution of cocaine, in violation of 21 U.S.C. § 846; and (2) aiding and abetting the distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. On appeal, Carter challenges the breadth of the evidence admitted against him. For the following reasons, we reverse the judgment of the district court.

In September 1989, a confidential informant allowed Federal Bureau of Investigation agents based in Cleveland, Ohio, to monitor telephonic cocaine negotiations between him and Wendell Daniels. Daniels was based in Detroit, Michigan. During the initial stages of the investigation, the informant called Daniels numerous times. During these telephone calls, the two men talked about the informant purchasing cocaine from Daniels. On October 10, the informant called Daniels to arrange a purchase of ten kilograms of cocaine, but Daniels told the informant that he was waiting to hear from his supplier. After Daniels and the informant had finished their conversation, Roderic Carter, the defendant in this case, called Daniels for reasons that are not apparent from the record. Within minutes after the Daniels–Carter conversation, Daniels called the informant and left a message for the informant to call Daniels. When the informant called Daniels, Daniels told the informant that he was waiting on his supplier to supply him with some cocaine. After this second Daniels–informant call, Carter telephoned Daniels twice. Despite all these conversations, any proposed cocaine deal eventually fell through.

Between October and December, there were numerous recorded telephone conversations between the informant and Daniels about the purchase and sale of cocaine. During this same time period, Carter and Daniels talked frequently on the telephone. On December 1, undercover FBI Agent Frederick Snellings drove the informant from Cleveland to Detroit where the informant met Daniels at a gasoline station. Snellings and the informant went to Dan-

iels' residence and from there Daniels paged his supplier's beeper. A short time after Daniels paged the supplier, Carter called Daniels and Daniels advised Carter to hurry up because the informant was waiting for the cocaine. Within minutes after this telephone conversation, Carter arrived at Daniels' residence. After agreeing on the price of $13,500 for 500 grams of cocaine and being paid $10,000 of the $13,500, Carter informed Daniels that the cocaine would be of better quality than some of the cocaine that Carter had previously supplied Daniels. Carter then informed Daniels that "his woman" (Sonya Funchess) would deliver the cocaine. After leaving the Daniels residence, Carter called Daniels and told him Funchess would deliver the cocaine in five or ten minutes. After a few minutes had past, Funchess delivered approximately 500 grams of cocaine to the informant.

The FBI's investigation continued past the December 1 cocaine transaction between Carter and the informant. On December 18, Agent Snellings and another FBI agent met Daniels and Frank Renfroe at a Detroit gasoline station, which was the same station at which Agent Snellings and the informant had met Daniels on December 1. The four individuals then drove to Daniels' residence and from there Renfroe called Odolph Daniels and directed him to deliver the cocaine. Odolph Daniels and Jason Young delivered the cocaine to the Daniels' residence, and federal agents arrested Renfroe, Young, Wendell Daniels, and Odolph Daniels.

A grand jury subsequently indicted Carter and Funchess for (1) conspiracy to possess with intent to distribute and distribution of cocaine, in violation of 21 U.S.C. § 846; and (2) aiding and abetting the distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The indictment charged that Carter, Funchess, Young, Wendell Daniels, and Odolph Daniels were involved in a single conspiracy, which ran from September 27, 1989, until December 18, 1989.

Because the grand jury indicted Carter and Funchess jointly, the two individuals received a consolidated trial. At trial, FBI Agent Snellings testified first about the December 1 cocaine transaction involving Wendell Daniels, Carter, and Funchess. When Agent Snellings began to testify about the December 18 cocaine transaction involving Renfroe, Young, Odolph Daniels, and Wendell Daniels, Carter objected and argued that evidence regarding the December 18 cocaine transaction was inadmissible because it was unfairly prejudicial and constituted evidence of a second, separate conspiracy. The district court overruled Carter's objection and allowed Agent Snellings to testify about the December 18 transaction and also allowed the use of exhibits that were associated with the December 18 transaction. In an effort to demonstrate that Carter was not associated with the December 18 transaction, Carter's attorney cross-examined Agent Snellings about Carter's involvement in the December 18 transaction. During this cross-examination, Agent Snellings admitted that he had no knowledge or evidence that Carter was associated in any way with the December 18 transaction.

Next, over Carter's objections, the government offered a series of witnesses who testified about financial matters related to Carter and/or Funchess. For example, a representative of a Detroit appliance store testified that from approximately January 1989 until December 1990 Carter purchased over $3,000 worth of appliances from the store. These purchases included a freezer, an air conditioner, a gas dryer, four televisions, and a stereo. Later, a representative of the Ford Motor Credit Corporation and a representative from a Detroit bank each testified that their respective organizations had received automobile loan applications from Carter. On the applications, which the court admitted into evidence, Carter had stated he was employed at a place called the Tex Market.

In an effort to prove that Carter did not work at the Tex Market or any other place, the government produced two witnesses. Again, Carter objected to both witnesses' testimony. The first witness, who was employed by the local electric company, produced documents and testified that the

electric company had not provided electrical service to the market since 1987. A second witness, FBI Special Agent Demetri Friedrich, produced documents and testified that the market had not filed federal income tax returns for the calendar years 1987 through 1990. The agent also introduced evidence that Carter did not file federal income tax returns for the calendar years 1985 through 1990.

At the close of the evidence, Carter asked the district court to instruct the jury on multiple conspiracies and submitted a proposed instruction. The district court refused to give an instruction for multiple conspiracies and merely gave the jury an instruction for a single conspiracy. During deliberations, the jury sent the district court several questions about the conspiracy charge including a question inquiring if a defendant was guilty of conspiracy whether or not he was in the organization for the entire period of the organization's existence. The jury eventually found Carter guilty on both counts of the indictment.

On appeal, Carter asserts that the district court abused its discretion by allowing the government to use the following evidence at trial: (1) evidence of Carter's purchase of various household items over a two-year period; (2) evidence of Carter's two bank loan applications; and (3) evidence of the failure of the Tex Market, Carter, and Funchess to file tax returns. Carter contends this evidence was irrelevant and extremely prejudicial.

■ Under the Federal Rules of Evidence, relevant evidence is generally admissible while irrelevant evidence is inadmissible. Fed.R.Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. This court accords the district court broad discretion to determine whether or not to admit evidence based upon considerations of relevance and materiality. *United States v. Walton,* 909 F.2d 915, 925 (6th Cir.1990); *United States v. Phillips,* 575 F.2d 97, 100 (6th Cir.1978). *See United*

*States v. Stull,* 743 F.2d 439, 445 (6th Cir. 1984) (because the district court's determinations of relevancy depend on the exercise of considerable judgment within the context of the entire trial, appellate courts should not lightly overrule the trial court's decision), *cert. denied,* 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). We will reverse a district court's decision to admit evidence based on considerations of relevance and materiality only if the district court abused its discretion. *Walton,* 909 F.2d at 925; *United States v. Schrock,* 855 F.2d 327, 333 (6th Cir.1988).

In this case, we hold that the district court abused its discretion by allowing the government to use a plethora of irrelevant financial information. We fail to see how the fact that Carter purchased a few appliances over a two-year period makes it more likely that Carter engaged in a cocaine transaction on December 1, 1989. The same holds true regarding the loan applications that Carter filed with two lending organizations stating that he worked for a particular supermarket, when apparently he did not. These applications, which Carter apparently submitted at least a few months before the alleged cocaine transaction, may suggest that Carter has a tendency to be untruthful, but they do not move a rational fact finder toward the conclusion that Carter sold cocaine to FBI agents on December 1.

Finally, we are most troubled by the government's use of the tax returns in this narcotics case. Undoubtedly, under certain circumstances a defendant may be tried in a single proceeding for violating the narcotics laws and for violating the tax laws. *See United States v. Bibby,* 752 F.2d 1116, 1121 (6th Cir.1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986). The case before us, however, is not a joint narcotics-tax fraud case; it is simply a narcotics case. Evidence that Carter, Funchess, and the supermarket failed to file federal income tax returns may lead a rational trier of fact toward the conclusion that the three, especially the individuals, are tax defrauders; thus, the evidence would be probative evidence in a tax fraud

case. However, such evidence is not probative on the issue of whether Carter engaged in a cocaine transaction on December 1, 1989.

We recognize that there are cases that allow the government to use a defendant's tax returns and evidence of his spending habits in order to obtain a conviction in a narcotics case. *See, e.g. United States v. Rawle*, 845 F.2d 1244 (4th Cir. 1988); *United States v. Young*, 745 F.2d 733 (2d Cir.1984), *cert. denied sub nom. Myers v. United States*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United v. Chagra*, 669 F.2d 241, 255 (5th Cir.), *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982). However, the cases allowing the use of such evidence generally fall into two categories. The first category of cases involve defendants who have been charged with operating a continuing criminal enterprise, in violation of 21 U.S.C. § 848. In a continuing criminal enterprise case, the government must establish, *inter alia*, that the defendant obtained substantial income or resources from his repeated violations of the federal narcotics laws. Thus, in a continuing criminal enterprise case, it is necessary that the government produce evidence of a defendant's finances and/or lifestyle. The second category of cases involve narcotics cases in which the defendant engaged in extravagant spending and/or possessed massive unreported wealth. In this second category of cases, the evidence of the lack of a federal tax filing (or underreporting) in combination with proof of valuable tangible possessions or extravagant purchases creates the inference that the defendant does not possess a legitimate source of income to support his affluent lifestyle and, therefore, the income must originate from narcotics operations. The instant case, however, does not fall into either of these two categories of cases. The government did not charge Carter with operating a continuing criminal enterprise, and, accordingly, it did not have to establish Carter's financial net worth. Additionally, the evidence in this case did not paint Carter as maintaining an unexplainably affluent lifestyle. Thus, we conclude the district court erred in allowing the government to use the financial evidence. Because we also conclude that the district court's error was not harmless, Carter is entitled to a new trial.

Finally, Carter presents us with two additional arguments. First, Carter asserts that there is a prejudicial variance between the indictment and the government's evidence at trial because the indictment charged a single conspiracy but the evidence at trial demonstrated multiple conspiracies. Second, Carter asserts that the district court erred by failing to give the jury an instruction on multiple conspiracies. Because we have already determined that Carter is entitled to a new trial, we need not determine the correctness of Carter's final two assertions. However, inasmuch as there is insufficient evidence to link Carter to the December 18 transaction, we direct the district court on remand to limit the new trial to the conspiracy covering only the December 1 transaction, unless the prosecution presents new evidence linking Carter to the December 18 transaction, and to the substantive charge against Carter.

For the foregoing reasons, we reverse the judgment of the district court and remand for a new trial.